<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SCOTT MICHAEL KUBIK, | Civil Action No. 14-CV-3712 (SDW) |
| Plaintiff, | |
| | **OPINION** |
| v. | |
| CAROLYN W. COLVIN, | June 8, 2015 |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**WIGENTON**, District Judge.

Before this Court is Plaintiff Scott Michael Kubik's ("Plaintiff") appeal of the final administrative decision of the Commissioner of Social Security ("Commissioner"), with respect to Administrative Law Judge Michal L. Lissek's ("ALJ" or "ALJ Lissek") denial of Plaintiff's application for Social Security Disability Insurance Benefits under Title II of the Social Security Act (the "Act"). Plaintiff, pursuant to 42 U.S.C. § 405(g), seeks review of the determination of the Commissioner, which denied Plaintiff's applications for Social Security Disability Insurance Benefits.

This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). Venue is proper under 28 U.S.C. § 1391(b). This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.

For the reasons set forth in this Opinion, this Court **AFFIRMS** the ALJ's decision.

1

# I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

## A. Procedural History

On January 21, 2010, Plaintiff filed an application for Social Security Benefits. (Tr. 279-82.) On August 20, 2010, Plaintiff's claim for Social Security Benefits was denied. (Tr. 138; 140-44.) Plaintiff filed a Request for Reconsideration, but it was denied on May 05, 2011. (Tr. 139, 147-49.)

On May 18, 2011, Plaintiff requested a hearing before an ALJ, which was held on April 10, 2012. (Tr. 150-52; 86-126.) Supplemental hearings before the ALJ were also held on August 30, 2012 and January 16, 2013. (Tr. 67-75; 30-65.) On January 29, 2013, ALJ Lissek denied Plaintiff's application for Social Security Benefits ("ALJ's decision"). (Tr. 11-29.) On February 4, 2013, Plaintiff requested a review of the ALJ's decision, which the Appeals Council denied on April 24, 2014. (Tr. 1-5.) On June 10, 2014, Plaintiff appealed to this Court. (Compl.)

## B. Personal and Employment History

Plaintiff was forty-one years old at the time of the ALJ hearing in 2012. (Tr. 90.) Plaintiff is divorced, and lives with his parents in Kenilworth, New Jersey. (Tr. 456; 91, 96.) Plaintiff has a high school education. (Tr. 91.) Plaintiff worked for the Post Office for approximately fourteen years, twelve years as a mail carrier and the last two years as a custodian. (Tr. 93, 296.) On May 6, 2009, Plaintiff resigned from the Post Office. (Tr. 91.)

Plaintiff alleges that he is disabled because of his heart, knee, and mental conditions, and that his disability makes it difficult for him to perform normal daily activities. Plaintiff's parents prepare most meals for him and do his laundry. (Tr. 306, 96-98; 97.) Plaintiff claims that it is difficult for him to walk for long periods of time and to climb stairs because his alleged disability

makes him very tired. (Tr. 306-07.) Plaintiff stated that his daily activities include a fifteen to twenty minute walk every day. (Tr. 304.) Plaintiff claims to have difficulty sleeping and that he awakes every few hours, but has no problem with personal care. (Tr. 32, 305, 319.)

Plaintiff stated that his daily activities also include cleaning his room, dusting the house, reading, watching television, playing video games, listening to music, and caring for his pets. (Tr. 304, 305, 321.) Before the onset of his alleged disability, Plaintiff enjoyed landscaping, playing baseball, and grilling food, but Plaintiff claims he is now unable to engage in such activities. (Tr. 323.)

Plaintiff has a history of IV drug abuse. (Tr. 456.) Plaintiff smoked approximately one pack of cigarettes per day for about twenty years. (Tr. 456.) Plaintiff sustained injuries from a mugging in 2000, which required four plates in his head. (Tr. 738.)

**C. Medical History**

*Heart Condition*

On December 7, 2009, Plaintiff was diagnosed with bacterial endocarditis, aortic valve disease, and aortic valve abscess. (Tr. 457.) Plaintiff visited to the emergency room at Overlook Hospital after feeling severe fatigue, drenching sweats at night, and a dramatically decreased appetite. (Tr. 458; 460.) An initial physical exam demonstrated that Plaintiff had an abnormal auscultation of the heart. (Tr. 461.) An EKG and CT scan showed that Plaintiff had an abscess in his aortic valve. (Tr. 456, 500, 507-16.)

On December 10, 2009, Plaintiff was transferred to Morristown Memorial Hospital in anticipation of a heart procedure. (Tr. 545.) On December 11, 2009, Dr. James P. Slater ("Dr. Slater") performed an aortic valve replacement on Plaintiff. (Tr. 540-43.) After the procedure, on December 16, 2009, Plaintiff was discharged from the hospital, and was noted to be breathing

comfortably and ambulating independently. (Tr. 548.) Plaintiff was transferred to rehab for long-term antibiotic therapy and physical therapy. (Tr. 549.) After participating in physical therapy several times, Plaintiff refused to participate further and was discharged from physical therapy. (Tr. 685.) During his antibiotic therapy, Plaintiff was noted to be ambulatory. (Tr. 649-52, 657, 666, 669-75.)

On a medical certificate signed on January 11, 2010, Dr. Slater opined that, after the surgery, Plaintiff would be able to return to work on February 8, 2010. (Tr. 454.) On January 15, 2010, Dr. Slater signed a letter elaborating on Plaintiff's condition, which stated that Plaintiff could not return to work for eight weeks following surgery. (*Id.*) After the eight weeks, Dr. Slater opined that Plaintiff could return to work with modified duties that did not require Plaintiff to lift more than 10 pounds until three months after surgery. (*Id.*)

After being discharged from the hospital, Plaintiff was under the care of a cardiologist, Sunil Mirchandani, M.D. ("Dr. Mirchandani"). (Tr. 726.) On January 15, 2010, Dr. Mirchandani noted that Plaintiff could not work because of his endocarditis and recent heart valve surgery, and estimated that Plaintiff could return to work on March 10, 2010. (Tr. 453.)

On March 9, 2010, Plaintiff was seen by Dr. Mirchandani, who noted that Plaintiff was ambulating without difficulty; had no chest pain, shortness of breath, dizziness, or palpitations; discontinued taking all of his medications, including aspirin; and continued to smoke. (Tr. 825.) Dr. Mirchandani also noted that she started Plaintiff on Toprol because of his persistent tachycardia and that she discussed with Plaintiff that he must be on aspirin for its antithrombotic effects. (Tr. 826.) On March 9, 2010, Redentor Mendiola, M.D., ("Dr. Mendiola") saw Plaintiff and noted that Plaintiff was doing well since his surgery, but that Plaintiff continued smoking. (Tr. 824.)

On May 4, 2010, Dr. Mirchandani saw Plaintiff on a semi-urgent basis. (Tr. 988.) Plaintiff stated that he had chest pain, which started around the time he stopped taking Toprol. (*Id.*) Plaintiff was prescribed Prednisone and instructed to re-start Toprol. (Tr. 989.) On June 8, 2010, Plaintiff told Dr. Mirchandani that his pain was immediately resolved. (Tr. 997.) Plaintiff had no chest pain, no exertional symptoms, but complained of intermittent fatigue. (*Id.*) Dr. Mirchandani opined that his fatigue could be caused possibly by anemia. (Tr. 998.)

On July 7, 2010, Plaintiff was seen by Joseph Dilallo, M.D., ("Dr. Dilallo") for a consultative examination. (Tr. 738.) Plaintiff complained about pain in his chest and that Prednisone did not help. (Tr. 738.)

On September 14, 2010, Dr. Mirchandani stated that Plaintiff had done well in the last nine months since his aortic valve replacement. (Tr. 787.) Dr. Mirchandani opined that heavy lifting was Plaintiff's biggest restriction. (*Id.*) According to Dr. Mirchandani, Plaintiff should not lift anything over 15 pounds, and other restrictions are based on Plaintiff's overall condition and tolerance. (*Id.*)

*Treatment for Headaches and Fatigue*

Plaintiff claims to have a history of migraine headaches since he was a child. (Tr. 738.) As a result of a mugging in 2000, Plaintiff underwent surgery and four metal plates were inserted into his skull. (*Id.*) Since the mugging, Plaintiff has complained about concussions. (*Id.*) Plaintiff claimed that he experiences an aura of flashing lights. (*Id.*) The migraine headaches allegedly occur one to three times a week and can last for the entire day. (*Id.*) To relieve the migraine headaches, Plaintiff takes Ibuprofen and lies in a dark room for its duration. (*Id.*)

Plaintiff also received treatment for fatigue. On October 26, 2010, Plaintiff visited Dr. Mendiola and complained about fatigue. (Tr. 1011.) Plaintiff explained to Dr. Mendiola that he

5

participated in community service, looked for a job, and was in the process of applying for disability benefits, but he felt fatigued and unable to do strenuous activity. (*Id.*) Plaintiff believed that his fatigue might have to do with his prior history of Lyme disease, but Dr. Mendiola conducted a physical examination and found that Plaintiff was essentially normal. (Tr. 1011.)

On August 27, 2011, Plaintiff visited his primary care physician, Marla Abramson, M.D. ("Dr. Abramson") and complained of fatigue and difficulty sleeping. (Tr. 1255.) Plaintiff reported that he exercised regularly by taking walks. (*Id.*) Dr. Abramson conducted a physical examination and found everything to be normal, but noted that Plaintiff had stopped taking Seroquel and stopped seeing his psychiatrist. (*Id.*) Dr. Abramson concluded that Plaintiff was likely fatigued because of his insomnia. (*Id.*) Dr. Abramson prescribed a sedative and encouraged Plaintiff to engage in good sleep habits, hygiene, exercise, consume a well-balanced diet, and quit smoking. (*Id.*)

*Treatment for Depression*

On October 27, 2010, Plaintiff was involuntarily admitted to Trinitas Hospital after an attempted suicide by overdose. (Tr. 905.) Plaintiff overdosed on twenty pills of Seroquel and tested positive for heroin. (*Id.*) Plaintiff was diagnosed with depressive disorder, opioid dependence, and poor coping skills. (Tr. 906.) When Plaintiff was discharged on November 5, 2010, a mental status examination noted that Plaintiff's mood was euthymic, his affect bright, and his thoughts organized and goal oriented. (Tr. 905.)

Plaintiff underwent a treatment in an intensive outpatient program from November 12, 2010 through February 1, 2011, which occurred four times a week in group, individual, and

family sessions. (Tr. 1103.) During this time, Plaintiff was free from any mood altering chemicals as evidenced by the random urine screenings and breathalyzer tests. (Tr. 1103.)

From February 9, 2011 through March 22, 2011, Plaintiff received weekly treatment sessions with Ronald Loffredo, Ed.D. (Tr. 1149-54.) Dr. Loffredo's mental status examination noted that Plaintiff was alert, had normal speech, and appropriate behavior and appearance, but that at times he had a depressed mood, distracted concentration, and imprecise memory. (Tr. 1150.) Dr. Loffredo opined that Plaintiff had no limitations in concentration and persistence, social interaction, adaption, or in activities of daily living. (Tr. 1152.) Plaintiff also received suboxone therapy from March 17, 2010 through January 10, 2012. (Tr. 1245-52.)

*Treatment for Knee Pain*

On January 5, 2011, Eric Mirsky, M.D., ("Dr. Mirsky") examined Plaintiff for knee pain. (Tr. 1014.) Plaintiff explained to Dr. Mirsky that he had ACL reconstruction on his right knee fifteen years ago, and that he twisted his knee six months prior to seeing him. (*Id.*) On examining the knee, Dr. Mirsky noted that Plaintiff had a small effusion, but that he was ambulating with a normal gait. (*Id.*) After ordering an x-ray, Plaintiff noted that although some mild degeneration consistent with early osteoarthritis was apparent, no acute fractures were evident. (*Id.*) Dr. Mirksy's diagnosis was that Plaintiff had a right knee sprain. (*Id.*)

On January 13, 2011, Dr. Mirsky, performed a right knee arthroscopy and partial medial and lateral meniscectomy. (Tr. 1018.) In a follow-up examination on January 27, 2011, Dr. Mirksy noted that Plaintiff had no complaints. (Tr. 1018.)

*Capacity to Work and Vocational Expert's Opinion*

Two state agency physicians examined Plaintiff's medical records and opined on Plaintiff's capacity to work. On July 21, 2010, Jyothsna Shastry, M.D., ("Dr. Shastry") opined

7

that Plaintiff could perform work consistent with sedentary work, like stand or walk for only two hours out of an eight-hour workday and sit for a total of six hours in an eight-hour workday. (Tr. 749.) On August 2, 2010, Joan F. Joyson, Ph.D., ("Dr. Joyson") examined Plaintiff's medical records and competed a Mental Residual Functional Capacity Assessment. (Tr. 774-76.) Dr. Joyson opined that Plaintiff may have some trouble with concentration, but that Plaintiff would be able to sustain adequate concentration, persistence, and pace for "simple work, follow complex directions, adapt to workplace changes and respond appropriately to supervision." (Tr. 776.)

The ALJ also received opinions from a medical expert and an impartial vocational expert. The opinion of the agency's medical expert, Martin Fechner, M.D., ("Dr. Fechner") regarding Plaintiff's capacity to work was consistent with Dr. Shastry's opinion. (Tr. 1262-70.) During the ALJ hearing, the vocational expert considered someone with Plaintiff's age, education, work experience, his ability to limited physical labor, limited to jobs with simple instructions, that could be learned in one month or less, had no contact with general public, working in proximity to co-workers, and occasional contact with supervisors. (Tr. 55-59.) The vocational expert opined that Plaintiff could perform unskilled jobs such as photocopy operator or injection molding machine tender. (Tr. 56, 59-60.) On January 29, 2013, the ALJ denied Plaintiff's application.

## II. LEGAL STANDARD

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g). This Court must affirm the Commissioner's decision if there exists substantial evidence to support the decision. 42 U.S.C. § 405(g); *Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003). Substantial evidence "means such relevant evidence as a reasonable mind might accept

as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995). Stated differently, substantial evidence consists of "more than a mere scintilla of evidence but may be less than a preponderance." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).

"[T]he substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Accordingly, the standard places a significant limit on the district courts scope of review: it prohibits the reviewing court from "weigh[ing] the evidence or substitute[ing] its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Therefore, even if this Court would have decided the matter differently, it is bound by the ALJ's finding of fact so long as they are supported by substantial evidence. *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012) (quoting *Fargonli v. Halter*, 247 F.3d 34, 35 (3d Cir. 2001)).

**III. DISCUSSION**

In determining claims for disability under the Act, the SSA utilizes a five-step sequential evaluation process. 20 C.F.R. 416.920(a). If at any step, a disability determination is made, the evaluation ends. *Id*.

First, at step one, the ALJ must make a determination as to whether the individual is currently engaged in "substantial gainful activity." 20 C.F.R.416.920(b). If so, the individual is found to be not disabled. Next, at step two, the ALJ must make a determination whether the individual suffers from a "severe impairment," or has a combination of impairments that is "severe." (20 C.F.R. 416.920(c). If the individual does have a severe impairment or a severe combination of impairments, the analysis proceeds to the next step. If not, the individual is not disabled.

At step three, the ALJ compares the individual's impairments of combination of impairments against those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the severity of the individual's impairments or combination of impairments meets or medically equals the criteria listed in Part 404, Subpart P, Appendix 1, and meets the duration requirement, then the individual is deemed disabled. If not, the analysis proceeds to the next step.

Following the third step, the ALJ must identify the individual's residual functional capacity ("RFC").  An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. The ALJ considers all impairments in this analysis, not just those deemed severe. 20 C.F.R. 416.920(e); 416.945; SSR 96-8p.

At the fourth step, the ALJ determines whether the individual is capable of engaging in his past relevant work. If so, the individual is not disabled. If not, the ALJ then moves to step five. Here, it is the burden of the SSA to prove that the individual is capable of adjusting to other work considering his RFC, age, education, and work experience.  If the individual is capable of engaging in other work that exists in significant numbers in the national economy, then the individual is not disabled.  If not, then the individual is disabled.

In the instant matter, at step one, ALJ Lissek found that Plaintiff did not engaged in SGA since May 6, 2009, the alleged onset date.  (Tr. 16.)

At step two, ALJ Lissek concluded that Plaintiff has the following severe impairments: aortic valve endocarditis, headaches, history of IV heroin abuse, right knee problem, cognitive impairment, depression, and traumatic brain injury.  (Tr. 16.)

At step three, the ALJ found that Plaintiff's impairment or combination of impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404 Subpart P, App. 1.  (Tr. 16.)  *See* 20 C.F.R. §§ 416.920(d), 416.925, 416.926.  Plaintiff

challenges the ALJ finding regarding whether Plaintiff's mental impairment meets or exceeds the listing 12.04.  *See* Pl.'s Br. 32.  Plaintiff argues that his mental impairment meets or equals 12.04 of the listed impairments because he suffers from "severe major depression."  Pl.'s Br. 32.  However, ALJ Lissek's findings at step three are supported by substantial evidence on the record.

In order to meet the criteria under the 12.04 listing, Plaintiff must meet the criteria in paragraph A along with meeting the criteria in paragraph B.[1]  20 C.F.R. Part 404 Subpart P, App. 1. 12.04A. In order to satisfy paragraph A, Plaintiff must "substantiate medically the presence of a particular mental disorder."  *Id*.  There is no dispute regarding whether Plaintiff satisfies the criteria in paragraph A.  In order to satisfy paragraph B, Plaintiff's mental disorder has to meet two of the four following limitations: "1) marked restriction of activities of daily living; or 2) marked deficiencies in maintain[] social functioning; or 3) marked deficiencies in maintain[] concentration, persistence, pace; or 4) repeated episodes of decompensation, each of extended duration."   20 C.F.R. Part 404 Subpart P, App. 1. 12.04A. A marked restriction or limitation "means more than moderate but less than extreme."  (Tr. 17.)

Here, the ALJ's finding that Plaintiff does not satisfy paragraph B is based on substantial evidence. (Tr. 17-18.)   First, although Plaintiff did report some difficulty in daily living activities, Plaintiff reported that he took care of his pet, dusted, walked fifteen to twenty minutes a day, read, watched television, and played video games.  (Tr. 305-07, 323.)  Further, Dr. Loffredo opined that Plaintiff had no limitations in activities of daily living.  (Tr. 1153.)  Second, Plaintiff has moderate restrictions in social functioning.  (*See* Tr. 739-40, 756.) The ALJ did account for Plaintiff's fatigue in his social functioning.  (Tr. 17; *see* Tr. 308.)

---

[1] A claimant may also meet the criteria under 12.04 by meeting the criteria in paragraph A and C. Plaintiff does not contend that he meets paragraph C.

11

Third, the ALJ found that Plaintiff has only a moderate restriction in maintaining concentration, persistence, or pace because, although he claims to be distracted. (Tr. 310; Tr. 758, 770, 1152.)  Dr. Loffredo noted that Plaintiff had no limitations in concentration and persistence. (Tr. 1152.)  Dr. Joyson and Dr. Gelber separately noted that Plaintiff had moderate limitations in maintaining concentration, persistence, and pace. (Tr. 758, 770.)  Also, there is no evidence, and Plaintiff does not argue, that Plaintiff suffered through any episode of decompensation for an "extended duration."  Thus, the ALJ's determination that Plaintiff's impairment or combination of impairments do not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404 Subpart P, App. 1 is supported by substantial evidence.

Before undergoing the analysis under step four, ALJ Lissek determined that Plaintiff's RFC demonstrated that Plaintiff is capable of performing "a range of light work as defined in 20 C.F.R. § 404.1567(b)," but is limited to jobs that can be learned in one month or less, involve simple instructions, work in proximity of coworkers, occasional contact with supervisors, and away from the general public. (Tr. 19.)  An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 416.920(e).  The ALJ evaluates the credibility of subjective complaints based on the record has a whole. 20 C.F.R. § 404.1529.  Here, Plaintiff argues that the ALJ Lissek's RFC finding is merely conclusory and not supported. Pl.'s Br. 35, 36.  This Court finds that the ALJ's RFC finding is supported by substantial evidence in the record. (Tr. 18-22.)

The ALJ placed weight on Dr. Fechner's opinion because it was consistent with the objective medical evidence. (Tr. 21; 1262-70.)  Plaintiff's cardiologist estimated that Plaintiff could return to work on March 10, 2010. (Tr. 453.)  Dr. Slater opined that Plaintiff would be

able to return to work on February 8, 2010 with modified work duties. (Tr. 454.) Plaintiff was noted to be doing well since his aortic valve replacement: he ambulated without difficulty; he had no chest pain, shortness of breath, dizziness, or palpitations. (Tr. 825, 997.) Plaintiff also had no edema, headaches, or shortness of breath. (Tr. 649-65, 739.) Plaintiff's cardiologist opined that Plaintiff's biggest restriction is heavy lifting, noting that he should not lift anything over fifteen pounds. (Tr. 787.) Moreover, the state agency psychologist opined that Plaintiff was able to sustain adequate concentration, persistence, and pace for simple work, follow complex directions, adapt to workplace changes, and respond appropriately to supervision. (Tr. 776.)

At the fourth step of the analysis, ALJ Lissek found that since Plaintiff's RFC allows only for light work, he could not perform the requirements of his past relevant work as a mail carrier because that work requires a medium level of exertion (Tr. 22; 54-64); *see* 20 C.F.R. §§ 404.1520(e)-(f), 416.920(f).

At the fifth step, the ALJ found that, Plaintiff is capable of performing other SGA present in the national economy. (Tr. 22.) In reaching this decision, ALJ Lissek considered Plaintiff's RFC, age, education, and work experience. Plaintiff was only thirty-eight years old at that time. (Tr. 22.) Plaintiff has a high school education and is able to communicate in English. (Tr. 22.) Plaintiff has a RFC for light work. (Tr. 18.)

At the hearing, the hypothetical ALJ Lissek provided to the vocational expert adequately set forth Plaintiff's limitations. (*See* Tr. 54-60.) In response, the vocational expert opined that significant number of jobs exist for Plaintiff.[2] Thus, the ALJ's finding of "not disabled" is supported by substantial evidence. (Tr. 23.)

---

[2] These positions include 2,500 local and 80,000 national ticketer positions; 1,800 local and 75,000 photo copy operator positions; and 600 local and 11,000 jobs national inspection molding machine tender. (Id.)

13

## IV. CONCLUSION

For the reasons set forth above, the Commissioner's disability determination is **AFFIRMED**.  An appropriate order will follow.

s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:   Clerk
cc:     Parties